We have a one matter on the calendar today and I am told everyone is present and thank you for making it through the weather. Judge Carney will be participating by video because of the weather. Judge Carney, can you hear well? I can. I hear very well. And I can see you very well. I think we are ready to proceed. May it please the court. A little, just a little background. I think if one steps aside a second of the concept of taking everything in favor for the state or for the government, one would see that this was a homicide that occurred on the spur of the moment. And that the Waco shot Sir Dawson over a, some sort of to move away from that. And the only piece of evidence in this case that talks about involving my client in the shooting is by Mr Ford. There are three major witnesses for the government in this case, Ford, Grieger and Lewis. I'm sure the court's aware of their backgrounds. Ford, a convicted of all sorts of criminal records. Uh, the same Grieger, even worse than the same blues. Um, the, I point out the fact that the only testimony that ties my client to Ford to show that basically this is an extremely weak case from the government standpoint. And the thing which I'm most concerned about, which is the 404 B matter and it's weighing under 403, um, takes on added importance when you have a case which I think is as weak as this. Ford's testimony was that he saw my client firing at him. Uh, that is totally inconsistent with ballistics, which show that the shots that killed him were obviously from the, um, the basement situation that Dawson's testimony grabbed my client and pulled him out. Uh, uh, 38 caliber bullets in Dawson. Why? Why? Why are the ballistics inconsistent with, um, your client having fired at because I was missing because by the time my client was a minute and a half before he got upstairs, he was on the on the ground and there's no indication whatsoever that he, uh, the bullets don't indicate there was any, any, any situation that we weren't found. Uh, the, the shells were actually found in the cut out. Uh, but the, uh, I'd be in a different, different situation if I were just arguing this on whether there's sufficient evidence. I don't think there is, quite frankly. But there's also evidence that in the earlier part of the sequence of events, um, he was, he was out there with, um, the other two with, uh, with his brothers. No, there's lots of evidence of a drug conspiracy. I mean, I mean, there's at that time, there's also present when guns were being pulled and they didn't, they didn't actually shoot at each other. But that precedes the shooting. There is some testimony. There was a standoff earlier in the day that involved your client, right? The testimony said that that involved your client was to the effect that your client was involved in the standoff. I'm sorry. Wasn't the testimony that your client, um, was involved in that standoff was present. That was, uh, I believe from listen, I've forgotten which one it was, but the standoff, they backed off and dealt with it. But let me, your client brandished a gun during the standoff earlier. He did. So isn't that some evidence that he was involved in in a conspiracy that resulted in the shooting a little bit later that day? Your honor, that may be. But the point being, this is not a strong case when I'm talking. What I want to talk about really is the similar act. I'd like to ask about that. But just on the sufficiency point alone, just for a to us that this the case against your client rested or fell with the testimony of Mr Ford. That's right. And, uh, now we come to the, um, there's also Ford's testimony is questioned by the driver. But let me just my time being, I can't Greg Greger, who is a admitted to being a murderer, a murderer for hire. Now, remember, Ford was, uh, definitely was taken off the table so he could testify. Greger has this long, long criminal record, and he goes and testifies that my client on a previous occasion was prepared to kidnap, handcuff and take off some drug dealers and out of the woods and shoot them. Um, I can't think of anything. I really try to think of examples which would be a greater example of propensity. Evidence could be a situation there. The rubric under which they were admitted was a similar act, and it was for purpose of showing closeness of brothers and familiar firearms. Neither of these were really in dispute. Uh, that and the excuse me. This is Judge Carney. A quick question. You said that the closeness of the brothers was not in dispute. So from your perspective that had been established. Yes, correct. I don't. I don't. There's any question about that. There was lots of testimony of that effect. That's with respect to Brian and David. But with Sam as well, or I think so, that the, um so that am I right? And am I right in thinking that the Maryland conspiracy, such as it was, was alleged to have occurred between 1990 and 92, about two years before the murder in question. That's right. I think that the conspiracy ended in 92 when rigor was one of the difficult things is what we have here, obviously, is a two decade old murder. And, uh, my experience and try and old cases is it takes less evidence to convict in those cases than it does. And the juries are more forgiving of the state and time. And here we have to put yourself in the situation. How do you counter rigor's testimony? There's no effective way of to answer a uncharged crime. And what is the Fifth Amendment effectively done in that situation? I could you address? The government also says that the evidence was relevant to knowledge and intent, not just the relationship between the brothers, not just his background evidence, but it helped to establish your clients knowledge with regard to the offense. I've thought about. I don't really understand that. I mean, I don't know knowledge of what an intent of what that that he intended because he intended to shoot a Jamaican. He now intended to shoot when he came out. Knowledge that the gun would go off. I just that the one thing that the rule that I've trained is this is not to be propensity evidence, propensity evidence. We could have a system that says propensity evidence is relevant, and it could be good. I mean, there's no question that many people in our daily lives think propensity is being important, but we've made a judgment as a society that that is not to be in the criminal justice system in the uniform rules in the federal rules, most state rules. And what we have here is this is cases of sudden. The brief says it is really a wolf in sheep's clothing in terms that this is if there were ever with propensity evidence. I think this is it. I think yeah. I'm having difficulty hearing. Are there mics on? We haven't started yet. You're okay. I saw lips moving. I felt I would ask. Thank you. Good afternoon. My name is Vivian Shevitz. I represent David Gill, the one who's the weed dealer. I have to just pause for a moment. Judge Carney, are you able to hear clearly? I am now. Thank you. I want to address the insufficiency of the evidence as against David Gill. I think the best way to do that is just to refer you again to pages two through wherever that argument ends in my reply brief, where I discussed the fact that there are there's no evidence in this record that has been of the of quality or the nature accepted by appellate courts to sustain a conspiracy conviction in this He didn't ask about quantity. There was no evidence he knew about quantity of the drugs that Brian Gill was handling. You're focusing on counts one and two. Yes. Quantity insufficiency as to those counts. Quantity insufficiency as to those counts. Yes. All right. Thank you. And pages two at sec of my reply brief, I think, sets it out. The point is David Gill was doing his own thing, and there is no evidence really that he knew the extent or was even interested in what his brother or brothers were doing. But beyond that, your colleague, excuse me just a minute. Your colleague just told us that there was plenty of evidence that the brothers were very close. Yes. Very close. They were brothers. Everybody knew they were very close. They all grew up and went to school together. Well, I don't know about Waco. I have not focused on Waco. He's not my client, Samuel McIntosh. David Gill and Brian Gill lived in the same place in Park Hill, and they were very close. They had relatives together. They were very close. Does that provide any basis in addition to the evidence of individual events that might be sufficient for jury to infer that David had knowledge of the extent of Brian's drug activity? Only through speculation, and that is not permitted. But what I want participated in the sales, there's evidence that the conspiracy began in April or so of 1994, that it continued through May, and they were still involved in June, the day of the shooting. There's no evidence at all that David, I'm sorry, that David Gill was involved in any of that. The most that was shown as to David Gill was that he may have done some isolated hand-to-hand sales of a little glassine bag. There's no evidence where he got it. There's no evidence it was continuing. There was no evidence of any connection between those hand-to-hand sales at all and any conspiracy or Brian Gill. They're the hand-to-hand sales. A couple, maybe. Help me understand the record if I'm misunderstanding it. Sure. But they took place in the vicinity of he lived in that vicinity, and there were, I don't know where they, the one that he pled guilty to. There was a sale he pled guilty to, and it had zero to do with any conspiracy. He didn't admit it. It wasn't charged. There's no evidence that it had anything to do with him, with the other brothers. It was just part of David Gill's sad, ongoing life of being involved in the drug market and living there on Park Hill. But all of the evidence showed, and everybody said that that guy was the weed dealer. But I'd like to address the statement against interest because that, oh I'm sorry. Yes, this is Judge Carney. Sorry it's a little tricky being on the screen and not there and present. I just wanted to follow up with one quick question. There was some general testimony, wasn't there by Mr. Ford, that in response to the question, what if anything did you see David doing around 160 in the early 90s, that he saw David selling crack cocaine just generically, which is consistent with the evidence of specific transactions, but suggests a more general observation about how he was busy. So your contention though is that this still adds up to not enough. It just because someone sells some drugs doesn't make them part of a conspiracy that involves a specific quantity on a specific date in specific amounts and a 280 gram. There's nothing to show that David Gill had any knowledge of that, any knowledge, much less intent to participate. But what the government used to convict him was the statement against interest. And what they say, and what they state, is all three brothers confronted Dawson, broke into his car, robbed him of his drugs and proceeds, and beating him up, leaving Dawson with an injury on his face. Respectfully, Judge Amon should not have let that statement in. The foundations aren't met. In my brief I discussed there is, it's not against his interest in context, and the cases say that you must look in context. It's not, he had a motive to lie, because he was speaking to Paul Ford, who had thought he had stolen all his drugs and money. So if you say to Paul Ford, someone else stole my drugs and money, that is a motive to lie to Paul Ford about that. He didn't say he saw them break into the car, to the declarant to Paul Ford. He didn't even say that. He didn't say he saw anybody. So when I break, when I raise no personal knowledge, there's no testimony that, that the dead person told Ford that he saw people, he saw them breaking into his car. Maybe it happened at a different time. It's all very... Well in context he says, he says he was beaten up. Well, and there was no evidence to corroborate that. Nobody, as I point out, showed, said that there was any injuries on his face. Nobody corroborated that at all. But can't we take the statement, can't we consider the statement, I was beaten up as implying at least personal, some personal knowledge of who it was that beat you up? Maybe beating him up, but maybe, but not breaking into his car and stealing the drugs. And the point is that in the proffer, right before Ford testified, Ford said he didn't even know, and Ms. Shihada said at page transcript 221, which is in my addendum at A4, she said she couldn't even recall if, if Ford testified or if Dawson had said to Ford that it was his brothers who did that or a brother. To me, to say, then Judge Ammon said, well it has some attributes of a statement against interest. With all due respect, the attributes of a statement against interest without satisfying the foundations. As to David Gill, I'm not saying it's not admissible as to the other guys. I don't know. I haven't focused on them. All I can say is Ford did not say initially, and Ms. Shihada did not know that he said in offering this statement, that David Gill was among the guys who did this. So there are a lot, a lot of inferences and that does not amount to strong corroboration, which is required under this court's, um, precedence. There really was not enough evidence to convict David Gill of this. He did his own thing. He was in jail a lot. He was his brother's brother. That doesn't mean he was his brother's keeper. And he should, his conviction should be reversed. Thank you. May it please the court. My name is Christopher Kniff and I represent Samuel McIntosh on this appeal. I did not represent him in the lower court. I know your honors are familiar with the brief and I'm not going to repeat some of the arguments that overlap that co council has made. But I would submit to this court that the case against Mr McIntosh is really different than the cases against the other two folks regarding this issue about the sufficiency of the weight of the crack cocaine that was involved in the conspiracy. And the reason I say that is because he was, as the court knows, acquitted of the subsequent cocaine conspiracy. Now that obviously occurred much later than the 1994 activity that is that the subject of the murder charge. But I think it's an important distinction to focus on as we think about the sufficiency of the evidence on the weight issue. That's the kind of the central point that we tried to make in our brief, which is it's not only a 8 48 e one a of a conspiracy existing a crack cocaine experience, conspiracy existing, but it has to be a B one a conspiracy. And I think when you look at the evidence which we tried to marshal in our brief, it's very clear that the cooperating witnesses who testified about the drug part of the conspiracy had little or nothing to say about Mr McIntosh. Donald Lewis, who I think was really the principal, um, co conspired or in that 1994 Brian and Lewis in the 94 conspiracy seemed to be the principal ones. They sort of buying the cocaine and then cooking it. And then, yes, your honor. And the record is pretty clear that the two of them were involved in more substantially more than than 280 grams. Would you agree with that? I would agree that the record suggests that your honor. I think when you when you the question that has become the others, to what extent did they know what? I mean, there is evidence that they were involved. To what extent did they know the extent of what Brian and Lewis were doing? Um, and there does seem to be evidence in the them over a period of time. In some ways, your honor. I think the testimony from Lewis and Ford, you know, maybe the best evidence of the lack of, um, knowledge or foreseeable knowledge about that weight. And again, it's not a question of their knowledge of the activity or the conspiracy. I would concede that there was general knowledge about that. But whether McIntosh knew of the weight. And when you look at Lewis's testimony, he said, among other things, that he saw McIntosh maybe once or twice at 1 1 60 Park Hill during the relevant time period and only once observed him selling crack. And to your honor's point, this is the guy who's with Gil, who the government put forward as kind of the leader of the of the operation. His right hand man is saying, I saw this guy once during the course of this activity. And therefore, your honor, I think he was there on the day of the shooting and was participating in the events on the day of the shooting. If it was indeed roughly 125 grams each time, 120 125 grams, you only need three days worth. Well, you need two things. I think you're on. You need a few days worth of that volume. And you need to show membership in the conspiracy, not just awareness, not just association with a brother, but actually participation in the conspiracy. And I think again, to go back to Lewis's testimony, and this is somebody who, you know, again, not to repeat myself, but is the right hand man. He's almost providing exculpatory information on that one point. And again, I'm not trying to argue the broader point. Excuse me. Hi, this is Judge Carney. So it wasn't the evidence, though, that that Lewis and Brian kind of alternated who was on days and nights. And it's not the fact that he saw him sell drugs only once is it's difficult to know exactly what to make of that. I'm not sure it's exculpatory. But I noted also that Mr. Yorick, the security guard at 160 said that testified that he had seen Sam many times on Park Hill Avenue, and that he saw him sell drugs and kind of a generic way not to just one on one occasion. Doesn't that tend to fortify the, the inference that he was in fact participating in a more regular way? I would say no, Your Honor, it may show that he regularly was involved in the sale of crack cocaine. It may show that. But if you look at Mr. Ford's testimony, he says, you know, that he saw McIntosh selling drugs, selling drugs at 160 Park Hill, he kind of corroborates the testimony, Your Honor, suggesting, but he didn't testify. There's nothing in the record from Ford that he ever saw McIntosh selling cocaine with the Gill brothers. So again, it's this, it's a, it's kind of a two pronged issue, I think. One, is he involved in the conspiracy? And then importantly for the statute, because the statute requires it, is he, is it foreseeable to him that this B1A wait was going on in the conspiracy? I know my time is up. If I can just touch on the issue of the four B evidence, because I think it's crucial in the context of what I've been explaining, because in the absence of evidence of the B1A wait in the 1994 time period and the acquittal in the later, I think it was 2011 to 13 time period, if I have that right, that evidence becomes even more crucial, I think, in terms of the proof, so to speak, of this Mr. McIntosh's drug dealing activity in the conspiracy. And so I think the prejudice is even more significant. And as we pointed out in our brief, we don't think there was an adequate 403 analysis conducted before that evidence was admitted. Let me ask, go ahead, Judge Carney. I want to ask, if we were to agree with you that the, this federal crime was not were to reverse, would your client be open to prosecution by the state for his participation in the murder of Mr. Dawson? I don't know the answer to that, Judge Carney. For one thing, I don't know what the statute of limitations would be at that time, because the murder is quite old. But certainly a, you know, murder in Staten Island is a state crime. I was going to ask, I'm sorry, did you have another question? No, please go ahead. Just on the argument that there was not a 403 balancing done, I mean, I understand the argument that knowledge and intent sounds a lot like propensity, and how, what exactly is the non-propensity chain that makes the Maryland evidence relevant. But it seems to me that, and help me understand how I'm misunderstanding, it seems to me the district court judge pretty clearly did a 403 balance. She made reference to whether the evidence was cumulative or not. She said, I'm going to wait till later, because I'll be able to do the rule 403 analysis better then. She may not have said rule 403 explicitly when she returned to the subject. But, but where are you, why are you concluding that the district court did not do the requisite balancing? I, I agree with your Honor that the, that Judge Ammon spoke to the issue of the cumulative nature of the evidence and addressed it and said she did not find it cumulative. But I think there's a further component to it, in the context of, of this case, which is, which is prejudice. What is the, is there a risk that the jury, hearing substantially similar activity by a single cooperator, is going to naturally rely on that to say, these guys have a propensity to do that. And I agree with you, it's a very fine line between what is knowledge and intent versus what is propensity. If you look at the government summation, which we cited in our, our brief, in talking about the Maryland activity, they say, why is it important? It shows you the relationship between Gil and McIntosh went far beyond being brothers. Then they say, it shows you that at a time before they murdered Dawson, Gil and McIntosh were willing to back each other up with violence, with murder, to protect their own drug turf. They were willing to plan and carry out murders together. Willingness, I would respectfully submit to you, your honor, that the difference between a willingness to do something and a propensity to do it, is there really no difference between those two. I see my time is well, well up, so I will, I'll sit down and ask that the court reverse the conviction. Good afternoon, your honors, and may it please the court. My name is Nadia Shahata, and I'm an assistant U.S. attorney in the Eastern District of New York. The government respectfully submits that the judgments against all three appellants in this case should be affirmed. Beginning with the arguments made by defense counsel regarding the sufficiency of the evidence, the defense counsel decided solely on Paul Ford for counts one and two. Apart from Mr. Ford's testimony, which was over a span of two days, subject to cross examination extensively by three able defense counsel at trial, it was, his testimony was also supported by 911 calls, about six or seven of them, if I recall correctly, and these were contemporaneous to minutes after the with guns shot at Mr. Dawson. There clearly was a shooting, there was certainly lots of evidence. I think, what about the argument that the evidence, that the quantity was foreseeable as to David Gill and McIntosh? Yes, I think the evidence, this court has to view that evidence in its totality and drawing all inferences short. So it starts with, I think, the locations where this happened and the roles of each of the three defendants. First, I think it's important to remember that the evidence showed in this case that this was a very discreet area. This was one avenue, Park Hill Avenue, which there was testimony you could get from one end to the other in about a matter of minutes walking. There also was evidence that there was competition, that there were other dealers in that area, indeed, at that very address. They were competing with each other to some extent. So there has to be something to connect these two defendants to the Brian and Lewis conspiracy. Yes, in our view, Your Honor, the heart of the conspiracy was at 160 Park Hill Avenue and what the conspiracy was about was who could control that building, who was and who wasn't. And I think it's important to remember that the underlying predicate crime for counts 1 and 2 is a conspiracy. So we don't need to show that Samuel McIntosh and David Gill were regular... Yes. Okay, I apologize. So starting with... And following up on Judge Chin's question, you do need to show that the 280 grams of crack cocaine was foreseeable to both McIntosh and David, right? Yes, that's correct. For the conspiracy, yeah. Yes. I hope you'll continue to address that, please. Yes. So I think part of what shows their involvement in the conspiracies is the actions on the very day of the murder. Starting with their role, among other things, there was testimony they sold at 160, but also was to back up their brother with violence, if necessary, in controlling that building. And we saw that from the very beginning. Now, I note the drug amount. I think there was... I think what you're saying is fair, but they're brothers, so they might have backed up each other anyway, whether they were involved together in drugs sales or not. Well, I think that's actually where the 404B evidence, why it was so probative, because as stated by all three counsel here today, there was this constant theme at trial as well of these people are  participants in the conspiracy. And that's why the 404B evidence was so probative in that case, because it showed McIntosh and Brian Gill, just two years prior, knowingly and intentionally engaging in a large scale crack conspiracy that involved ensuring that rival drug dealers couldn't take over drug spots that they controlled. And showed that it wasn't just about being brothers, what happened that day on June 22nd, 94. All those actions were part and parcel of the underlying drug conspiracy. And I think as far as drug... You have the actions that day, you have the 404B evidence, what else is there? You also have the testimony regarding the value of that building, 160. And that's what I was trying to get to in explaining the neighborhood. There was testimony about just how valuable it was to control a building, and that's why you needed violence to back it up. So I think the jury could reasonably infer that at this time period, these three men who were from that neighborhood, grew up there, and were all conceitedly by all three defense counsel, drug dealers in that neighborhood, knew the value of what it meant to control 160, and that that was well over 280 grams of crack cocaine. Now I would also... I know there were some arguments made by defense counsel that the evidence showed this was a spur of the moment murder, or single sale by Mr. McIntosh of crack cocaine that day. And I think the evidence showed just the opposite. Because you have to look at it in its totality, with everything that was going on that day, and in the weeks prior, which includes the statement against penal interest that Mr. Dawson made to Mr. Ford regarding having been beaten up and had his drug money and drugs stolen by Brian Gill and his brothers. And just one point on that. I think counsel said that I, when arguing this in front of Judge Ammon, I didn't even know if it was brother or brothers. That wasn't attributable to Mr. Ford. That was my mistake in the middle of trial, that I couldn't remember at that moment exactly what his anticipated testimony would say on that effect. But the testimony of Mr. Ford was clear. There was no equivocation. It was Brian Gill and his brothers. And to the extent that the defense argues that's ambiguous, there was certainly other evidence in the record that the jury could use to infer which brothers he was speaking of, and that is a matter that goes to the weight of that evidence, not its admissibility. In summation, you argue in the defense points, particularly the appellate's point, particularly to this statement, this testimony about Marilyn shows you that they were ready, the brothers, were ready and willing to murder rival drug dealers when their crack dealing and reputation were at risk. How do you explain that statement as not essentially inviting a propensity inference? I think if I'm remembering which statement you're referring to, I think the sentence before that was about this evidence is important because it shows you they weren't just brothers. And so it was in the very context of the criminal relationship between these two men that was certainly a contested issue at trial. And their readiness and willingness is a matter of the type of relationship they had and was a knowing and willing participant in the underlying conspiracy. Why isn't that propensity evidence? Because it's admitted for a proper purpose and it was argued for the precise purpose for which it was admitted. In a sense, your honor, all prior bad acts can be viewed, are detrimental and show that a person did bad things before and can be viewed as propensity evidence. I think the relevant question is, what is the purpose it's being admitted for and is that a proper purpose? What does the evidence of bad conduct in 1990, 1992, how is that relevant to showing intent in 1994? Well, first, I would submit that the time period is not that far away, but it's relevant to showing intent because the defendants made it an issue at trial saying they were only, they were each, every man for himself. Intent to do what? I mean, because they sold drugs earlier, they intended to sell drugs now. Doesn't that sound like propensity evidence? I would say intent to join the conspiracy, that they were working together, not separately. Why isn't that propensity evidence? Intent to join together? Because it's relevant to a contested issue of fact. I think the case law is, and I think the case is the Amity case, I'm specifically thinking of, but I think, and perhaps Huddleston as well, there's an acknowledgement by the courts that this is, that what 404B is about is normally propensity evidence is not allowed except when it is admitted for a proper purpose. And so that's, in our view, what happened in this case. You're saying it was propensity evidence, but that was allowed for a proper purpose? No, I may have inartfully said it. What I'm trying to say is that any evidence of prior bad acts can be it is not propensity evidence when it is admitted for a proper purpose such as criminal relationship between the co-defendants, such as knowledge and intent. And that is what the district court did here. That's not propensity evidence. That's evidence to show a relationship. So I think, you know, it's when you start calling it propensity evidence, I think where you get into trouble. I mean, if the evidence is to show a relationship, then that's appropriate. But if the evidence is to show an intent to join this conspiracy, that sounds to me like propensity evidence, that they're more likely to do the crime in question, which is this 1994 conspiracy. So why was it offered here? I think because here the defendants were asserting what amounted to essentially a mere presence defense, that what they were doing in that way to working together in a conspiracy. And so this goes directly to that. I think the court's opinion in the Zaxxon case is instructive in this sense. That was a case where the evidence was admitted of a prior drug conspiracy because the defendant who was charged with a drug transaction was claiming he had no knowledge of the conversations were about drug transactions and the court said no, the fact that you engaged in a drug conspiracy with the very same co-conspirator is probative of your knowledge in that sense. And I think it's a very similar situation here. This is Judge Carney. Even if we were to agree with you about the probative value of the I was troubled still about the second part of that with regard to a plan or discussion that they had about dealing with some competitors in a mortal way. And I gather that the evidence showed that it went slightly more than a discussion that a U-Haul was rented. But no one was harmed. It could have been just a discussion borne out of anger that they may or may not have acted on ultimately. So it didn't even rise to the level possibly of a prior bad act. And I wondered whether the balance there isn't tilted slightly in favor of the defendants in terms of the prejudicial effect as opposed to the other evidence about the conspiracy. Particularly because with regard to the murder that occurred, it seems like the evidence was very strong. They were all there and they all fired guns. So in terms of intent, you didn't really need it. Could you address the probative value and the balance as to that evidence? Yes. Well, I think the reason it's probative of intent, Your Honor, is not just the intent to commit the murder, to fire their guns and shoot at this or 848E charges. So it has to be meaningfully connected to the predicate crack cocaine conspiracy. And so the knowledge and intent portion, I think, is more directed to that portion, showing that they were not just knowingly and intentionally shooting at the victim, but knowingly and intentionally members of that predicate drug conspiracy. As to the prejudicial nature of the Maryland evidence, first, I do think it rises to a prior crime. Certainly agreeing to commit a murder is a crime in and of itself. Second, I don't think the highly probative value of this evidence was substantially outweighed by its prejudicial effect. And part of that is because I think certainly the charged crimes, which were an actual murder that resulted in an actual death of three brothers shooting repeatedly at this person, was much more alarming evidence than a murder conspiracy that never actually was consummated or carried through. And we have to remember as well that this is an abuse of discretion standard. So while a different judge may have viewed this evidence differently, the question really is, did the district court abuse its discretion in admitting this evidence? And I think the record is abundantly clear that Judge Ammon conducted a very careful analysis of this evidence, and it's the balancing required, and then additionally, the limiting instructions that she gave both during Mr. Grigger's testimony, a number of times during that testimony, and then extensively in the final charge to the jury. Could you address Dawson's statement to Ford and the argument that this doesn't fall within the penal interest exception? Because in context, if I understand the argument correctly, to the extent that Dawson is saying, I have drugs and drug money and I've been robbed of them, that wasn't in speaking to Ford against interest. Our argument is that it is against his penal interest. It's certainly evidence that he was, at the very least, guilty of possessing drugs and drug money. So that would certainly be probative in any trial against Mr. Dawson. I think you have to look, the entire statement is both inculpatory of Mr. Dawson himself and of the people who robbed him and beat him up of that money. And with regard to, I think there were some arguments made about whether there was sufficient corroboration. The case law is clear that you don't need independent corroboration. The statement itself and the circumstances of the statement itself are sufficient. And I think, in fact, the Casamento case from 1989 indicates that the court should actually not look at the credibility of the in-court witness in making that determination. And here, Mr. Dawson was speaking to a trusted criminal associate. He was, it was in the context of this associate, Mr. Ford, seeing him with a black eye and inquiring what that was about. And it was a short statement in response of what happened. There was no reason, he wasn't trying to curry favor, there was no reason for him to believe that law enforcement was listening in any way. Those are the types of things that courts have looked to determine whether a statement such as this is, has sufficient indicia of reliability and trustworthiness. And in our view, it certainly did here. Ms. Presider, may I ask another question? I see your counsel is almost out of time. I wondered if you could just circle back for a minute to the drug quantity question. I want to make sure I understand your argument about the value of the building. Was there specific testimony that you're referring to that anyone who controlled that location could be expected to have been dealing in more than 280 grams of crack cocaine, therefore that McIntosh and Bryan would have known and that that's a reasonable basis for the jury to infer quantity from? It seems to me that there are several steps of inference that you're asking, you're saying that it was reasonable for the jury to take if that's the basis for your quantity argument. So could you just make sure, or explain to me if I've misunderstood? Yes, Your Honor, certainly. I think there was testimony from Paul Ford who controlled a building right next door. It was building 141, and his testimony was that he had two main buildings in the Park Hill neighborhood that were his main competition, and one of those buildings was 160. There was plenty of evidence from Mr. Ford about just how valuable 141 was, and that he made tens of thousands of dollars from it. And so I think in context that 160 was his main competition is certainly evidence of the value of that building. In addition, there was testimony from Donald Lewis about the value of the building, about how many thousands of dollars he was making from that endeavor. And again, there's testimony, I believe, from some civilian witnesses about the extent of the drug dealing at that building and other buildings. This was like a constant thing of people coming to buy crack cocaine in this time period. And so McIntosh and Brian Gill would have been aware, since they're in the neighborhood, of the quantities, the dollars, the value, and therefore they could deduce the drug quantities that were at issue. Is that your... Yes, and it's not just that they were in the neighborhood, but that they were drug dealers in the neighborhood, crack cocaine dealers in the neighborhood. We had testimony from Paul Ford about that, as I think one of your honors mentioned. There was testimony from civilian witness who was a security guard, Montague Yorick, about that. He was certainly in a position to know, being someone who patrolled the area. And so that taken all together, viewed in the light most favorable to the government, in our view is sufficient. Thank you. Thank you, Your Honor. There may have been evidence of the value of the building somewhere out there, but there was none that my client, David Gill, knew about it or cared about it. Further, at page 26 to 28 of my brief, there is evidence that if David Gill was interested at all what was going on there, and he spoke also to David Lewis, he would have found out that David Lewis was doing his own thing and getting his own quantity from somewhere, and they were all doing their own things, and there was no hold on the building. At one point in my reply brief, page 7, I believe, there was a finding in another case in the Eastern District, a discussion of how 160 Park Avenue was a freelance building. So maybe they were trying to get a foothold there and maybe they were not, but that's all speculation because there was nothing to show that my client knew that. Now, Judge Chin, you asked whether there . . . I think, if I'm characterizing it right, whether there . . . because they were brothers, evidence of what Brian Gill knew could be attributed somehow to David Gill. No, no, no. That wasn't . . . Oh. When I asked about the brothers, it went to the issue of their activity on the day of the shooting and the brothers came together, and the government argues that that is evidence that they were in on their narcotics activity together. Well, if it were . . . The question was really whether another way of looking at it is that they were just brothers coming to each other's . Thank you all very well argued and we appreciate you battling the weather to make it to court. I'll ask the clerk to adjourn court. Court is adjourned.